UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL AUTO TOOLS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| AUTOMOTIVE LIFT INSTITUTE, INC.; | § | |
| LEFEVRE 7, LLC d/b/a ADVANTAGE | § | |
| LIFTS; BENDPAK, INC.; VEHICLE SERVICE | § | |
| GROUP, LLC d/b/a ROTARY LIFT; TOTAL | § | |
| AUTOMOTIVE LIFTING SOLUTIONS INC.; | § | |
| CHALLENGER LIFTS, INC.; INTEGRATED | § | |
| SUPPLY NETWORK, LLC; AMGO | § | |
| HYDRAULIC CORPORATION; MNM INC. | § | |
| d/b/a HALO LIFTS; TORIN INC.; TUXEDO | § | |
| DISTRIBUTORS, LLC; KREBS BROTHERS | § | |
| LLC; SONGA ENTERPRISES INC. d/b/a | § | |
| APLUSLIFT; BUDGET AUTOMOTIVE | § | |
| EQUIPMENT INC. d/b/a DAYTONA | § | |
| AUTOMOTIVE EQUIPMENT; DEREK | § | |
| WEAVER COMPANY; ATLAS AUTOMOTIVE | § | |
| EQUIPMENT, LLC; AND SNAP-ON | § | |
| INCORPORATED, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff National Auto Tools, Inc. ("Plaintiff"), files this *Original Complaint* against

Defendants Automotive Lift Institute, Inc.; Lefevre 7, LLC d/b/a Advantage Lifts; Bendpak, Inc.;

Vehicle Service Group, LLC d/b/a Rotary Lift; Total Automotive Lifting Solutions Inc.; Challenger

Lifts, Inc.; Integrated Supply Network, LLC; AMGO Hydraulic Corporation; MNM Inc. d/b/a

Halo Lifts; Torin Inc.; Tuxedo Distributors, LLC; Krebs Brothers LLC; Songa Enterprises Inc.

d/b/a APlusLift; Budget Automotive Equipment Inc. d/b/a Daytona Automotive Equipment; Derek

Weaver Company; Atlas Automotive Equipment, LLC; and Snap-On Incorporated (collectively, "Defendants") and respectfully shows the Court as follows:

## I.    INTRODUCTION

1.      This is a case about a trade association and its members acting as a cartel by colluding to artificially limit competition and capture market share through false advertising and anti-competitive conduct.

2.      Defendants own and operate businesses that sell vehicle lift systems. These systems are used nationwide by car enthusiasts, oil-change shops, and auto-mechanics. Each vehicle lift sells for thousands of dollars.

3.      Defendants are members of the Automotive Lift Institute. In 2017, the Automotive Lift Institute published updated *Safety Requirements for Construction, Testing, and Validation*, which purports to be "the safety and performance standard covering the design, construction, testing and validation of manually-driven, power-driven, stationary and mobile automotive lifts." The requirements purport to apply "to car lifts, truck lifts, automotive hoists, and vehicle lifts."

4.      The Automotive Lift Institute runs a "Lift Certification Program," which it touts and advertises as "the only accredited program in North America to independently test and validate that a car lift model meets all . . . safety and performance requirements." Manufacturers pay tens of thousands of dollars for the Automotive Lift Institute to test and certify their lifts. Lifts the Automotive Lift Institute deems worthy are given a golden ticket—an "ALI Gold Certification Label" and listed in a published "Directory of Certified Lifts." Once a lift is certied and receives a gold certification label, the Institute receives a per-lift fee of approximately $200 (*i.e.*, a *de facto* royalty of $200 per lift).

5. But, many, if not all, of the lifts "gold-certified" by the Institute fail to meet the Institute's published standards. Rather, the Institute's accreditation process has devolved into a simple pay-to-play scheme where lifts that clearly fail to meet the Institute's published standards are nonetheless "certified." And, these same lifts are held out to governmental agencies, insurance companies, and the general public as inherently safer, less risky, and more reliable than uncertified lifts.

6. To make matters worse, the Automotive Lift Institute has used its Lift Certification Program to aggressively seek market share for "certified" lifts (*i.e.*, for those lifts on which it receives a royalty). The Institute advertises that certified lifts are safer and less dangerous than uncertified lifts. Further, the Institute has successfully lobbied governmental agencies and insurance companies to functionally require that "every lift installed within their jurisdictions" have gold certified status from the Institute. Indeed, the Institute claims the International Building Code, the U.S. Occupational Safety and Health Administration rules, and provincial regulations in Canada all require gold-certified lifts.

7. This lawsuit seeks to end the Institute's pay-to-play scheme.

## II.    PARTIES

8. Plaintiff National Auto Tools, Inc. is a Texas corporation with its principal place of business in Fort Worth, Tarrant County, Texas.

9. Defendant Automotive Lift Institute, Inc. (the "Institute") is a New Jersey non-profit corporation which may be served through its registered agent, the Corporation Trust Company at 820 Bear Tavern Road, West Trenton, NJ 08628.

10.    Defendant Lefevre 7, LLC d/b/a Advantage Lifts ("Advantage Lifts") is a Pennsylvania limited liability company, which may be served at its registered office of 8 Rosecraft Run, Hanover, PA 17331.

11.    Defendant Bendpak, Inc. ("Bendpak") is a California corporation which may be served through its registered agent, Jeffrey Kritzer at 30440 Agoura Road, Agoura Hills, CA 91301.

12.    Defendant Vehicle Service Group, LLC d/b/a Rotary Lift ("Rotary Lift") is a Delaware limited liability company which may be served through its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

13.    Defendant Total Automotive Lifting Solutions Inc. ("TLS") is a Canadian corporation with an address of 2300 Speers Rd. W., Oakville, Ontario, L6L 2X8 Canada.

14.    Defendant Challenger Lifts, Inc. ("Challenger") is a Kentucky corporation which may be served through its registered agent, CT Corporation System at 306 W. Main Street, Suite 512, Frankfort, KY 40601.

15.    Defendant Integrated Supply Network, LLC ("Integrated") is a Florida limited liability company which may be served through its registered agent, C T Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

16.    Defendant AMGO Hydraulic Corporation ("AMGO") is a South Carolina corporation which may be served through its registered agent, Northwest Registered Agent, LLC at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

17.     Defendant MNM Inc. d/b/a Halo Lifts ("MNM") is a California corporation which may be served through its registered agent, Nadeem Abdo at 7521 Talbert Avenue, Huntington Beach, California 92648.

18.     Defendant Torin Inc. ("Torin") is a California corporation which may be served through its registered agent Jun Ji at 4355 E. Brickell Street, Ontario, California 91761.

19.     Defendant Tuxedo Distributors, LLC ("Tuxedo") is a Massachusetts limited liability company which may be served through its registered agent, Barry Lewis at 8320 US Hwy 67, Alvarado, Texas 76009.

20.     Defendant Krebs Brothers LLC ("Krebs") is a Florida limited liability company which may be served through its registered agent, Oswaldo Eric Krebs at 1250 Imeson Park Boulevard #201, Jacksonville, FL 32218.

21.     Defendant Songa Enterprises Inc. d/b/a APlusLift ("Songa") is a Washington corporation which may be served through its registered agent, Xueyi Wang at 13806 SE 42nd Pl, Bellevue, WA 98006.

22.     Defendant Budget Automotive Equipment Inc. d/b/a Daytona Automotive Equipment ("Daytona") is a Canadian corporation with an address of 101 Applewood Dr., Brighton, Ontario, K0K1H0 Canada.

23.     Defendant Derek Weaver Company ("Weaver") is a Texas corporation which may be served through its registered agent, Derek J Weaver at 2944 SE Loop 820, Fort Worth, Texas 76140.

24.     Defendant Atlas Automotive Equipment, LLC ("Atlas") is an Indiana limited liability company which may be served through its registered agent, C T Corporation System at 334 North Senate Avenue, Indianapolis, IN 46204.

25.    Defendant Snap-On Incorporated ("Snap-On") is a Delaware corporation which may be served through its registered agent, CT Corporation System at 1999 Bryan Street, Dallas, Texas 75201.

### III.    JURISDICTION AND VENUE

26.    This Court has federal subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff brings a claim herein under federal law. A federal question appears on the face of Plaintiff's complaint, is a substantial component of Plaintiff's claim, and is of significant federal interest.

27.    This Court has personal jurisdiction over each Defendant because this lawsuit arose from or directly relates to the contacts Defendants have created with Texas.  Among other contacts, on information and belief, Defendants other than the Institute have all sold vehicle lifts in Texas. *See World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980) (holding that the defendant manufacturer's placing of its product in the stream of commerce with the knowledge that the product would be used in the forum state is sufficient to constitute minimum contacts justifying the exercise of personal jurisdiction in the forum state).  Further, this Court has personal jurisdiction over the Automotive Lift Institute because the Institute has certified deficient vehicle lifts sold in Texas.

28.    On information and belief, venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the Northern District of Texas is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.  Further, venue is proper in this district under 28 U.S.C. § 1391(b)(3) because one or more defendants are located in Fort Worth, Texas.

## IV.    FACTUAL BACKGROUND

**A.    The Automotive Lift Institute creates a pay-to-play scheme for "gold certified" vehicle lifts.**

29.    Defendant Automotive Lift Institute, Inc. (the "Institute") is a trade association comprised of North American manufacturers and distributors of automotive lifts.

30.    The Institute states on its website that its mission is "to promote the safe design, construction, installation, inspection, and use of automotive lifts."

31.    The Institute is an Accredited Standards Developer for the American National Standards Institute, Inc. ("ANSI").

32.    Accordingly, the Institute develops ANSI safety standards for automotive lifts.

33.    The current ANSI/ALI ALCTV: 2017 Standard for Automotive Lifts – Safety Requirements for Construction, Testing, and Validation (the "Standards") were approved by ANSI on or about January 24, 2017.

34.    The Standards took effect on or about July 24, 2018 (the "2017 ANSI/ALI Standards").

35.    The Institute's website states, the "Lift Certification Program is the only accredited program in North America to test and validate that an automotive lift model meets the ANSI/ALI ALCTV certification and product safety listing requirements."

36.    The Institute's website concludes that "the only way to know that a lift has been third-party tested and certified to meet this standard is to buy an ALI Certified Lift."

37.    In or about 1998, the Institute began testing and certifying whether automotive lift models comply with the ANSI safety standards (the "ALI Lift Certification Program").

38.    Testing an automotive lift for compliance is expensive, costing upwards of $50,000 per lift model.

39.     If the Institute concludes that a particular automotive lift model complies with the ANSI standards, it issues an Institute Gold Label certifying compliance, which can be placed on the automotive lift by the manufacturer.

40.     Once certified for compliance, each certification decal costs approximately $200 per automotive lift sold.

41.     The Institute's website states that an "ALI Certification Mark" indicates that the lift complies with the following requirements among others:

    a.      "Lift models must be tested in accordance with the Program Procedural Guide and in accordance with the performance requirements of the American National Standard 'Automotive Lifts – Safety Requirements for Construction, Testing, and Validation' ANSI/ALI ALCTV (current edition)."

    b.      "The lift manufacturer's authorized production facility must meet quality control requirements that are outlined in the Program Procedural Guide. This is verified by frequent surveillance and plant inspections."

42.     Section 3 of the 2017 ANSI/ALI Standards states:  "[a]utomotive lifts shall not be labeled or otherwise described as conforming to this standard unless all applicable requirements are met."

43.     The Institute's website further states:  "[i]t is fraudulent to use the ALI Certification Label, or reference the Certification Program, on products that are not manufactured in compliance with all requirements of the applicable standards."

44.     The Institute's website states:  "[c]ertification extends to options and accessories" and "[u]se of non-certified options or accessories on a certified lift will void the certification of the lift."

45.     The Institute's website also stresses the importance of buying ALI Certified Lifts: "One more thing—a lift failure can result in serious injuries or death. It's critical to your safety and the safety of others in the shop that when you buy a car lift or truck lift, you focus first on safety by choosing only ALI Certified Lifts."

46.     Lift certification and testing is voluntary; however, every year more building codes and insurance companies require that automotive lifts be ALI certified. As the Institute's website states, "[t]he International Building Code (IBC), U.S. Occupational Safety and Health rules, and provincial regulations in Canada all require that every lift installed within their jurisdictions be certified to meet ANSI/ALI ALCTV."

**B.    The Institute certifies vehicle lifts that fail to meet the Standards.**

47.     The Institute engages in a pattern and practice of certifying lifts that fail to comply with the Standards.

48.     Few, if any, of the lifts certified by the Institute actually comply with the Standards.

49.     Among other things, the Standards include the following requirements:

a.     *9.1.4 Requirements for Control Devices*

- The lift control mechanism shall automatically be returned to the neutral or "off" position when it is released. The lift control mechanism shall provide protection from inadvertent casual contact that could result in energizing the lift drive system.

- The controls shall be located to provide easy accessibility to the lift operator. When operating the controls, the operator shall have clear visibility of the lift and of the load.

- Direction of movement shall be indicated. If controls are grouped for more than one lift, then the controls for each lift shall be clearly identified.

Section 9.1.4 is referred to hereafter as the "Lift Control Standards."

**b.**    ***9.2.1 Welding.*** Welding procedures shall be qualified, welders shall be certified, and weld joint design shall conform to the applicable sections of ANSI/AWS D1.1/D1.1M, *Structural Welding--Steel,* or CSA Standard W59M, *Welded Steel Construction (Metal Arc Welding),* for all welds located in the load path or in synchronizing assemblies. Section 9.2.1 is referred to hereafter as the "Welding Standards."

**c.**    ***9.2.2 Runways, Ramps, Chocks, and Runway Stops.***

- Lifts using runways shall be equipped with manual wheel chocks as the primary means to restrain the vehicle from inadvertently rolling off either end of the runways. The height of the chocks, when properly placed against the wheel(s), shall be not less than two (2) inches as measured from the surface of the runway.  Section 9.2.2 pertaining to Chocks is referred to hereafter as the "Chock Standards."

- Automatic stops, and/or fixed stops, shall be provided on runways as a secondary means to restrain the vehicle from inadvertently rolling off either end of the runways when raised. The automatic stops shall have commenced deployment when the rising runways have reached twelve (12) inches from the lowest elevation and shall have deployed to a height of at least four (4) inches at thirty-six (36) inches of rise from the lowest elevation. The height of the stops when fully deployed shall be not less than four (4) inches as

measured from the surface of the runway. Section 9.2.2 pertaining to runways is referred to hereafter as the "Runway Standards."

d.    ***9.2.11 Load Holding Device.*** All automotive lifts (including wheels-free-devices), except screw drive systems, shall incorporate an automatically-engaging mechanical device (e.g. a latching system) to prevent downward movement of more than six (6) inches after stopping motion. . . . After disengagement to permit lowering the load, the latches shall automatically reset when downward movement is stopped at any height above twenty-four 24 inches of rise [six (6) inches of rise for wheels-free-devices]. If latches do not automatically reset after disengagement to permit lowering the load, then the lift shall incorporate a warning label at the point of latch operation and at the point of lift operation that states that the latches do not automatically reset after lowering. Section 9.2.11 pertaining to labeling is referred to hereafter as the "Latch Labeling Standards."

e.    ***9.2.17 Inspection for Damage.*** Inspection of wire ropes, chains, and drive screws shall be achievable over their entire length. Inspection of mechanical load holding devices shall be achievable. Acme load nut wear shall be measurable. Section 9.2.17 pertaining to wire ropes, chains, and drive screws is referred to hereafter as the "Cable Inspection Standards."

f.    ***9.2.21 Accessory Equipment.*** If a lift model is designed to accommodate accessories, the stated capacity of the lift model shall not be reduced by those accessories.

- Wheels-free-devices, when incorporated into an automotive lift, shall meet the applicable requirements for automotive lifts as more particularly described in various paragraphs of this standard.

- If one or more wheels-free-devices are provided on runway or rail type lifts, then the total jacking capacity for any one jack or wheels free device shall be limited to seventy (70) per cent of the lift rated load capacity. If lift aggregate auxiliary jacking capacity exceeds the applied load of the lift then adequate safety labels shall be provided on the lift, the jacking devices, and in the written materials.

- Sliding or rolling jacking beams that carry and support such jacking devices shall be designed to limit the minimum distance between jack centerlines to the maximum centerline spacing of the runways, unless otherwise stated in the written materials accompanying the lift.

- Supporting members for the sliding or rolling jacking beams shall be designed to accommodate the total aggregate jacking capacity as specified by the lift manufacturer and stated in the written materials accompanying the lift. Means shall be provided to inhibit the sliding or rolling of the jacking beams off of either end of the supporting members.

- The total jacking capacity for any one jack or wheels free-device shall be limited to fifty (50) per cent of the lift rated load capacity.

- If add-on accessories, shipped separately, reduce or have the potential to reduce the rated load capacity (by five hundred (500) pounds or more) of the manufacturer's lifts to which they can be attached, they shall be permanently marked with their capacity and weight, and a statement that the lift rated capacity is reduced by the amount of the weight indicated.

- Should separate accessories be furnished for use with a lift conforming to this standard, the separate accessory shall conform to relevant American National Standards such as ANSI/ASME PASE covering portable automotive service equipment, including vehicle support stands.

Section 9.2.21 pertaining to accessory equipment is referred to hereafter as the "Accessory Equipment Standards."

g.      *9.2.22.2 Additional Requirements.* Caster attachments used to reposition surface lifts – Such devices shall incorporate means to prevent movement of the lift while loaded; and, shall not elevate the lift more than twelve (12) inches. Electrical attachments and their connecting means shall meet the electrical listing requirements defined within the standard. Hydraulic and pneumatic attachment connecting means shall be subject to the testing requirements of Section 10.2.14.  Section 9.2.22.2 pertaining to caster wheels is referred to hereafter as the "Caster Standards."

h.      *9.2.23 Machine Guarding/Color Coding.* Lifts shall conform to Occupation Safety and Health Administration, US Code of Federal Regulations, Title 29, Part 1910, Subpart O, *Machinery and Machine Guarding,* Section 1910.212 General Requirements for All Machines, and Section 1910.219, Mechanical Power Transmission Apparatus, and to Part 1910, Subpart J, General Environmental Controls, Section 1910.144, Safety Color Code for Marking Physical Hazards such as striking, stumbling, falling, tripping, and caught-in-between (such hazards are required to be yellow).  Pinch points, shear points, and rotating components shall be protected by guarding or clearances, otherwise warnings shall be provided. The required warnings may be covered by one or more of the Safety Labels described in paragraph 11.2.1 (ALI/WL101, for two post surface

mounted lifts; ALIMVL200, for surface mounted wheel engaging lifts; ALIMWL300, for hinged frame engaging lifts; ALIVWVL400, for wheel engaging mobile units; or ALI/VVL500, for in-ground lifts).  Section 9.2.23 pertaining to machine color coding is referred to hereafter as the "Color Coding Standards."

       i.    *10.1 Systems and Procedures.* A quality assurance system of policies and procedures shall be implemented and managed within the participant and manufacturer organizations by quality control personnel. The planned written system of policies and procedures shall embrace the following specific subjects as a minimum: organization, functions, duties and authority; policy and procedure publication, change control and record keeping; engineering drawing and specification publication, change control and record keeping; manufacturing process conformance determination, change control and record keeping; raw material and purchased part conformance determination and record keeping; component and end item conformance testing and record keeping; calibration and record keeping and traceability to the National Institute of Standards and Technology (NIST) or other national standards, for all gauges, measuring devices, tools, and instruments that affect the quality of the final product; and, control and disposition of nonconforming material.  Section 10.1 pertaining to quality control is referred to hereafter as the "Quality Control Standards."

       j.    *10.2 Testing.*  There will be circumstances where lifts will be presented for testing that incorporate, or anticipate the later incorporation of, wheels-free-devices, add-on accessories, or separate accessories. Devices in each of these categories will require testing to the applicable test regimens set forth in the following pages, or they may require testing to an American National Standard that applies to the particular device. In the event

that this standard does not specifically address the testing required for the device it is the duty of the NRTL to identify which, if any, of the testing requirements apply, or, if necessary, develop a separate regimen different from the tests described herein. Section 10.2 pertaining to accessory testing is referred to hereafter as the "Accessory Testing Standards."

k.    *10.2.9 Chock and Runway Stop Test.*

*Method.* The chocks shall be inspected to confirm the minimum height, and the runway stops shall be inspected to confirm the minimum height and deployment characteristics as specified in paragraph 9.2.2.

*Results.* The chocks and runway stops shall conform to the dimensional requirements and the runway stops shall conform to the deployment characteristics of paragraph 9.2.2.

Section 10.2.9 is referred to hereafter as the "Chock and Runway Stop Testing Standards."

l.    *10.3.3 Validation.* The facilities of the participant and the lift manufacturer shall meet the quality control requirements set forth in this standard. Quality control conformance shall be versified on an ongoing and continuing basis by frequent factory surveillance and plant visitation by the Nationally Recognized Testing Laboratory (NRTL). Section 10.3.3 is referred to hereafter as the "Validation Standards."

m.    *10.3.5 Validation.* The design of automotive lift models shall be reviewed for conformance to paragraph 8. Design, paragraph 9.1.1, Requirements for Strength, and other applicable paragraphs, by submittal of a comprehensive stress analysis for review and approval by a NRTL. Such comprehensive stress analysis shall address as a minimum,

all assemblies and components situated in the load path, including synchronization systems. The stress analysis shall assume a uniformly rated load, and full applied load, and shall address normal operation, fail-safe operation, and accessory equipment. Section 10.3.5 is referred to hereafter as the "Stress Analysis Standards."

n.    ***11.1 Instructions.*** Section 11.1 contains guidelines pertaining to manuals, lift-specifications, installation instructions, safety instructions, operating instructions, inspection and maintenance instructions, and specifications concerning vehicle lift points. The entirety of Section 11 is referred to hereafter as the "Manual Standards."

o.    ***11.2.2 Component Labels.*** Applicable component labels shall be permanently affixed to each corresponding component prior to the completion of installation. These labels shall be located so they are plainly visible and they shall be mounted on the particular component or assembly to which they apply. Electrical component characteristics and warnings shall be affixed to the electrical components to which they apply. Section 11.2.2 is referred to hereafter as the "Component Label Standards."

p.    ***11.2.3 Accessory Labels.*** Labels specifying rated load capacity shall be affixed to auxiliary adapters, wheels-free-devices, add-on runways, cross beams or other load bearing attachments, accessories, or configuration modifying components intended to be used with the automotive lift or that may affect the rated load capacity of the lift. Section 11.2.3 is referred to hereafter as the "Accessory Label Standards."

q.    ***11.2.4 Certification Label.*** In order that purchasers may be assured that the product has been subjected to third party product evaluation, supervision, and certification by an accredited Certification Body and a Nationally Recognized Testing Laboratory

(NRTL), there shall be an appropriate label indicating third party certification, which shall be affixed to the lift in a prominent location.  Only automotive lift model configurations witnessed and verified by the NRTL shall be labeled. It shall be incumbent upon the participant to submit all anticipated attachments, accessories, or configuration modifying components (that are located in the load path or otherwise affect intended vehicle accommodation) for testing, factory surveillance, and validation by the NRTL. Incorporation of such non-certified attachments, accessories, or configuration modifying components subsequent to lift certification and labeling shall render such lift certification and labeling null and void.  Section 11.2.4 is referred to hereafter as the "Certification Label Standards."

      r.    ***11.3 Product Identification.*** Each lift shall incorporate a nameplate which shall be readily visible and include the following information:

- The name, trademark, or other descriptive marking (including address) by which the participant may be identified;
- The country of origin;
- A distinctive catalog number, model number, model name, or the equivalent;
- A serial number;
- Date of manufacture if not included in the serial number;
- The rated load capacity; and
- The electrical or other ratings as applicable.

Section 11.3 is referred to hereafter as the "Product Identification Standards."

## C.    Defendants' gold-"certified" lifts do not meet the Standards.

50.    Defendants advertise vehicle lifts as gold certified that do not meet the Standards.

51.    By way of example, and not by way of limitation, Songa advertises the TR-10C-EXT and the TR-10C as gold certified.

52.    But, neither of these models meet the Standards because, among other things, they fail to comply with the Lift Control Standards, Welding Standards, Quality Control Standards, Accessory Testing Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

53.    By way of example, and not by way of limitation, Advantage Lifts advertises the DX-11000WD, B-4P7CL, B-4P8BB, B-4P8WB, B-4P8WF, DX-9000XLT, DX-9000HD, DXC10-A, and DXC10-S as gold certified.

54.    But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Component Label Standards, Certification Label Standards, and Product Identification Standards.

55.    By way of example, and not by way of limitation, Atlas and Integrated advertise the PVL140F-EXT, APEX9, PVL-14FPD, PVL-12FPD, PVL-10FPD, PVL9BP, and the APEX8-FPD as gold certified.

56.    But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Chock Standards, Runway Standards, Latch Labeling Standards, Cable Inspection Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standard, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

57.    By way of example, and not by way of limitation, Bendpak advertises the HDS-35X, HDS-37X, HDS-40, HDS-40X, HD-7MZ, HD-7P, HD-7PXN, HD-7PXW, HD-7W, HD-

9EWT, D4-9, D4-12A, HDS-14XT, HDSO-14AX, HDSO-14P, HDS-14, HDS-14LSXE, HDS-14X, HDS-18EA, HDS-18E, HDS-27, HDS-27X, GP-9XLT, GP-9F, HD-9AE, HD-9, HD-9ST, HD-9STX, HD-9XL, HD-9XW and the D4-9X as gold certified.

58.    But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Latch Labeling Standards, Cable Inspection Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standard, Validation Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

59.    By way of example, and not by way of limitation, Tuxedo advertises the TP12KSC-DX and TP10KAC-DX as gold certified.

60.    But, neither of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Color Coding Standards, Quality Control Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

61.    By way of example, and not by way of limitation, Weaver advertises the EFP8P000 and EFP9P000 as gold certified.

62.    But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Chock Standards and Runway Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standard, Validation Standards, Stress Analysis Standards, Manual Standards, Certification Label Standards, and Product Identification Standards.

63.     By way of example, and not by way of limitation, TLS advertises the LSS4P8PLDTAL, LSS4P14FDXL, TLS415DLORx1, and TLS408FDCWRx1 as gold certified.

64.     But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Chock Standards and Runway Standards, Cable Inspection Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standard, Validation Standards, Manual Standards, Component Label Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

65.     By way of example, and not by way of limitation, MNM advertises the HL2C-10KALI as gold certified.

66.     But, this model does not meet the Standards because, among other things, it fails to meet the Lift Control Standards, Welding Standards, Quality Control Standards, Accessory Testing Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

67.     By way of example, and not by way of limitation, Daytona advertises the TPO12KC-DE and TPO310ACX as gold certified.

68.     But, these models do not meet the Standards because, among other things, one or both of them fail to meet the Lift Control Standards, Welding Standards, Quality Control Standards, Accessory Testing Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

69.     By way of example, and not by way of limitation, Challenger and Snap-On advertise the 4P12EAX, zEELR507A, Q4P14E, Q4P14X, 4P14XFX, 4P14EFX, z4W15XAOLL,

z4W15EAOLL, z4W15XAO, z4W15EAO, AR4115XAX, AR4115XAO, AR4115EAX, AR4115EAO, 4115XFX, 4115XFO, 4115EFX, 4115EFO, 4115XAX, 4115XAO, 4115EAX, 4115EAO, Q4P15EC, Q4P15EC-AR, Q4P15EO, Q4P15EO-AR, Q4P15-XC, Q4P15XC-AR, Q4P15XO, EELR706LL, EELR705A, EELR745A, and FPA18210 as gold certified.

70.     But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Chock Standards and Runway Standards, Cable Inspection Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standard, Validation Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

71.     By way of example, and not by way of limitation, Rotary Lift advertises hundreds of models of lifts as gold certified.

72.     But, these models do not meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Chock Standards and Runway Standards, Latch Labeling Standards, Cable Inspection Standards, Accessory Equipment Standards, Caster Standards, Color Coding Standards, Quality Control Standards, Accessory Testing Standards, Chock and Runway Stop Testing Standard, Validation Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

73.     By way of example, and not by way of limitation, AMGO advertises the OH-10 as gold certified.

74.     But, this model does not meet the Standards because, among other things, it fails to meet the Lift Control Standards, Welding Standards, Quality Control Standards, Accessory Testing

Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

75.    By way of example, and not by way of limitation, Krebs advertises the KB10R and KB10A as gold certified.

76.    But, none of these models meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Quality Control Standards, Accessory Testing Standards, Validation Standards, Stress Analysis Standards, Accessory Label Standards, and Certification Label Standards.

77.    By way of example, and not by way of limitation, Torin advertises numerous models of lifts as gold certified.

78.    But, these models do not meet the Standards because, among other things, they fail to meet the Lift Control Standards, Welding Standards, Quality Control Standards, Accessory Testing Standards, Validation Standards, Stress Analysis Standards, Manual Standards, Accessory Label Standards, Certification Label Standards, and Product Identification Standards.

79.    Defendants' advertisement and publication that they meet the Standards, even though they do not, gives each of them a competitive, unfair advantage in the marketplace to the detriment of Plaintiff and others.

**D.    The Institute tries to make participation in its pay-to-play scheme mandatory.**

80.    The Institute has engaged in a campaign to convince customers, insurers, and others that gold-certified lifts are inherently safer and more reliable than uncertified lifts.

81.    On its website, the Institute states:

There's more riding on your vehicle lift than cars and trucks. If you're the technician who relies on a car lift to get your job done every day, your safety is riding on it. If you're the shop owner, service manager or dealer whose livelihood depends on your technicians' safety and performance, your business is riding on it. With so much riding on your automotive lifts, it's crucial that they are chosen with care.

The safety standard covering the design, construction and performance of car lifts in North America is ANSI/ALI ALCTV (current edition): "Safety Requirements for the Construction, Testing, and Validation of Automotive Lifts." Not all lifts sold in North America meet the requirements outlined in this standard.

The ALI Lift Certification Program is the only accredited program in North America to independently test and validate that a car lift model meets all ANSI/ALI ALCTV safety and performance requirements. So when you're in the market to buy a car lift, the only way to know that a lift has been third-party tested and certified to meet this standard is to buy an **ALI Certified Lift.**

82.    The Institute has also successfully lobbied for insurers and others to require consumers to use gold-certified lifts.

83.    The Institute's website notes that the International Building Code, the U.S. Occupational Safety and Health Administration, and provincial regulations in Canada "all require that every lift installed within their jurisdictions be certified to meet ANSI/ALI ALCTV":

## Your Safety Is Riding on It

One more thing—a lift failure can result in serious injuries or death. It's critical to your safety and the safety of others in the shop that when you buy a car lift or truck lift, you focus first on safety by choosing only ALI Certified Lifts.

The International Building Code (IBC), U.S. Occupational Safety and Health rules, and provincial regulations in Canada all require that every lift installed within their jurisdictions be certified to meet ANSI/ALI ALCTV. But unless mandated by an authority having jurisdiction (AHJ), lift testing and certification is voluntary for most manufacturers in North America. That means responsibility for buying certified lifts rests with you, the customer. Be an educated consumer! Always look for the ALI Gold Certification Label before buying a vehicle lift.

**D.      Plaintiff refuses to participate in the Institute's pay-to-play scheme and loses market share.**

84.      Plaintiff National Auto Tools, Inc. is a company founded in 2006 in Fort Worth, Texas, which among other things, manufactures and sells two-post and four-post automotive lifts.

85.      When Plaintiff first began business, very few building codes or insurance companies required Institute certified lifts. Although Plaintiff's lifts are safe, it was not worth the extra expense to obtain the Institute's certification. However, in recent years, substantial numbers of building codes and insurance companies began requiring the Institute's certification, locking Plaintiff out of several markets without the Institute's certification. Therefore, Plaintiff began researching how it could also obtain the Institute's certification.

86.      However, during the course of its research, Plaintiff discovered that most, if not all, ALI-certified lifts did not actually comply with the 2017 ANSI/ALI Standards despite ALI certifying that hundreds of automotive lifts complied with these standards. Nonetheless, the

manufacturers and distributors of these purportedly ALI-certified lifts advertised that they were compliant.

87.     Consequently, Plaintiff was left with two choices: either:  (1) remain uncertified and locked out of numerous markets that require ALI certification; or (2) engage in the Institute's pay-to-play scheme.

88.     Plaintiff chooses the first option.

## V.     CAUSES OF ACTION

### COUNT I – Lanham Act Violation

89.     Plaintiff incorporates by reference the above numbered paragraphs as if fully restated in full herein.

90.     The intent of the Lanham Act "is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations."

91.     The Lanham Act states "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with

another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

92.    Defendants have violated 15 U.S.C. § 1125(a)(1) by, among other things, falsely advertising or promoting the characteristics of Defendants' vehicle lifts.

93.    Defendants have used in commerce words, terms, names, symbols, devices, and combinations thereof of false designation, false or misleading descriptions of fact, and false and misleading representations of fact.

94.    Among other things, Defendants have advertised their vehicle lifts as complying with the Standards even though the lifts do not comply with the Standards.

95.    Further, Defendants have affixed gold certification labels on their vehicle lifts which state that their lifts comply with the Standards even though the lifts do not comply with the Standards.

96.    Advertising the lifts as complying with the Standards and affixing gold certification labels stating that the lifts comply with the Standards—even though the lifts do not comply—is likely to cause and has caused confusion and mistake as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by another person.

97.    Advertising the lifts as complying with the Standards and affixing gold certification labels stating that the lifts comply with the Standards—even though the lifts do not comply—is likely to deceive and has deceived a substantial segment of potential and actual customers as to

the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by another person.

98.     Advertising the lifts as complying with the Standards and affixing gold certification labels stating that the lifts comply with the Standards—even though the lifts do not comply—in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of Defendants' goods, services, or commercial activities.

99.     The false statements, deceptions, and misrepresentations are material, in that they are likely to influence and have influenced customer purchasing decisions.

100.    Defendants' lifts are sold in interstate commerce.

101.    Defendants' actions and misrepresentations have proximately caused an injury to Plaintiff's commercial interest in sales or business reputation.

102.    Defendants' actions have caused Plaintiff to lose sales and market share.

103.    Defendants' actions have proximately caused damages to Plaintiff.

104.    Plaintiff seeks:  (a) profits made by each Defendant from the sale of each lift advertised as comply with the Standards that do not, in fact, comply with the Standards; (b) damages sustained by the Plaintiff in lost sales; (c) the costs of this action; and (d) the reasonable and necessary attorneys' fees of Plaintiff.

105.    Plaintiff seeks treble damages as allowed by law.

106.    In the alternative, if necessary, Plaintiff seeks exemplary damages as allowed under Texas law.

107.    Defendants have fraudulently concealed the conduct complained of herein.

## COUNT II – Anti-Trust Violation

108.    Plaintiff incorporates by reference the above numbered paragraphs as if fully restated in full herein.

109.    In the alternative, if necessary, Plaintiff brings a claim for breach of the federal anti-trust statutes.

110.    The federal anti-trust statutes provide that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

111.    Defendants—those directly selling vehicle lifts and the Institute—engaged in anticompetitive conduct by which the "Standards" became merely a ploy to obscure a conspiracy against competing manufacturers such as Plaintiff.

112.    Defendants conducted a joint action that resulted in an unreasonable restraint on trade.

113.    Defendants engaged in a conspiracy to restrain trade and produce an anticompetitive effect on the vehicle lift market.

114.    Defendants' conduct, as a whole, is manifestly anti-competitive and unreasonable.

115.    Defendants jointly endeavored to disadvantage competitors, including Plaintiff, by either directly denying or persuading or coercing customers to deny relationships and business Plaintiff and others needed in the competitive struggle.

116.    In other words, by lobbying for insurance companies and others to require gold-certified lifts that do not comply with the Standards, Defendants have cut off access to a market necessary to enable Plaintiff and others to compete.

117.    Further, Defendants have cut off access to a market necessary to enable Plaintiff and others to compete by requiring that Plaintiff and others pay a *de facto* royalty of $200 per lift—a royalty Plaintiff is unwilling to pay.

118.    Defendants' conduct amounts to both an unlawful purpose and produces an anticompetitive effect.

119.    Defendants' actions have proximately caused damages to Plaintiff.

120.    Plaintiff seeks:  (a) economic damages; (b) treble damages; (c) costs; and (d) attorneys' fees.

### COUNT III – Unjust Enrichment

121.    Plaintiff incorporates by reference the above numbered paragraphs as if fully restated in full herein.

122.    In the alternative, if necessary, Plaintiff brings a claim for unjust enrichment.

123.    Defendants, through their conduct, have wrongfully secured a benefit or have passively received one that it would be unconscionable to retain.

124.    Defendants, through their actions, have tried to pass off vehicle lifts that do not comply with the Standards as those that are in full compliance with the Standards.

125.    In doing so, Defendants willfully obtained a competitive advantage in the market through fraud or undue advantage.

126.    And, by doing so, Defendants have caused Plaintiff to lose sales and market share in the vehicle lift market.

### COUNT IV – Injunctive Relief

127.    Plaintiff incorporates by reference the above numbered paragraphs as if fully restated in full herein.

128.    Plaintiff seeks injunctive relief pursuant to any available federal statute or principal of equity, including but not limited to 15 U.S.C. § 26 and 15 U.S.C. § 1125.

129.    Plaintiff has suffered and will continue to suffer irreparable injury resulting from Defendants' violations of the Lanham Act and federal anti-trust law.

130.    Remedies available at law are inadequate to fully compensate Plaintiff for its injuries.

131.    Considering the balance of the hardships between the Plaintiff and Defendants, a remedy in equity is warranted.

132.    The public interest would not be disserved by a permanent injunction.

133.    Plaintiff seeks injunctive relief prohibiting each Defendant from activities that have violated and that would continue to violate the Lanham Act, including, but not limited to, falsely advertising that lifts that do not meet the Standards are in full compliance with the Standards.

134.    Plaintiff seeks injunctive relief prohibiting each Defendant from activities that have violated and that would continue to violate federal anti-trust law, including, but not limited to, falsely advertising that lifts that do not meet the Standards are in full compliance with the Standards.

## VI.    JURY DEMAND

135.    Plaintiff demands a trial by jury and tenders the appropriate fee herewith.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.    Economic damages;

B.    Disgorgement of profits made by Defendants as a result of the wrongful conduct complained of herein;

C.    Treble damages to the extent allowed by law;

D.    For attorney fees to the extent allowed by law;

E.    Injunctive relief prohibiting Defendants from conduct that violates the Lanham Act as described herein;

F.    Injunctive relief prohibiting Defendants from conduct that violates federal anti-trust laws as described herein;

G.    For costs; and

H.    For such other and further relief as is just in the circumstances.

Dated: September 8, 2025

Michael K. Reer[1]
State Bar No. 24088281
mreer@fbfk.law
Desireé M. Malone
State Bar No. 24132390
dmalone@fbfk.law
**FERGUSON BRASWELL FRASER KUBASTA PC**
2500 Dallas Parkway, Suite 600
Plano, Texas 75093-4820
Telephone: 972.378.9111
Facsimile: 972.378.9115

and

Robert L. Florance, IV
State Bar No. 24087520
rlf@florancepllc.com
**FLORANCE, PLLC**
777 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone No.: 817.438.0555

**ATTORNEYS FOR PLAINTIFF**

---

[1] Per Local Rule 83.10, Michael Reer resides in Fort Worth, Texas and he maintains an office at 777 Main Street, Suite 3200, Fort Worth, Texas 76102.